YARBORO A. SALLEE,                     )
                                       )
          Plaintiff,                   )
                                       )
v.                                     )
                                       )
TENNESSEE DEPARTMENT OF SAFETY,        )
DENNY KING, Individually and as        )
FORMER COMMISSIONER OF SAFETY;         )     No. 3:03-0723
JERRY L. SCOTT, Individually           )     JUDGE ECHOLS
and as FORMER DEPUTY                   )
COMMISSIONER OF SAFETY; ROGER          )
HUTTO, Individually and as             )
COUNSEL TO COMMISSIONER; JOE           )
BARTLETT, Individually and as          )
SUPERVISING ATTORNEY; GERRY            )
CROWNOVER, Individually and as         )
ATTORNEY FOR DEPARTMENT OF             )
SAFETY,                                )
                                       )
          Defendants.                  )

## MEMORANDUM

Pending before the Court is Defendants' Motion for Summary Judgment (Docket Entry No. 118), to which Plaintiff Yarboro A. Sallee ("Sallee") responded in opposition and Defendants filed a reply.

Sallee was formerly employed as a Staff Attorney III in the office of the Tennessee Department of Safety located in Knoxville, Tennessee. Her employment was terminated on July 11, 2002.[1] As a

---

[1]Sallee insists her termination occurred on July 11, 2003 (Docket Entry No. 135 ¶ 1), but her position on summary judgment conflicts with her own complaint stating that the termination occurred in 2002. (Docket Entry No. 26 ¶¶ 103, 112.) Her personnel file clearly indicates the termination occurred in 2002 (Docket Entry No. 134-17 at 7-9) and other documentary evidence in the record is consistent with a 2002 termination date.

result, she brought this suit against the Tennessee Department of Safety; Denny King, individually and as former Commissioner of the Department of Safety; Jerry L. Scott, individually and as former Deputy Commissioner of the Department of Safety; Roger Hutto, Individually and as Counsel to the Commissioner; Joe Bartlett, Individually and as Supervising Attorney; and Gerry Crownover, Individually and as Attorney for the Department of Safety. Sallee asserts a due process claim under 42 U.S.C. § 1983[2] (Count One); sexual harassment and retaliation claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101, *et seq.* (Counts Two and Three); intentional infliction of emotional distress and outrage (Count Four); intentional interference with the conduct of a lawful occupation (Count Five); common law retaliatory discharge (Count Six); and civil conspiracy (Count Seven).

Defendants move for summary judgment in their favor. Sallee did not respond to Defendants' arguments concerning Counts Four and Five and, therefore, under Local Rule 7.01(b), the lack of a response indicates Sallee has no opposition to Defendants' motion for summary judgment on these claims. Because Defendants have

---

[2]Sallee also asserted claims for conspiracy under 42 U.S.C. § 1985(3)in Count One and for civil conspiracy in Count Seven. Although Defendants address the § 1985(3) claim in their Memorandum in Support of Motion for Summary Judgment (Docket Entry 119 at 21-23), District Judge Aleta A. Trauger previously granted Defendants' Motion to Dismiss the conspiracy claims pursuant to the intra-corporate conspiracy doctrine. (Docket Entry Nos. 47, 50 & 59.)

2

shown their entitlement to summary judgment as a matter of law on Counts Four and Five (Docket Entry No. 119 at 23-29), summary judgment will be entered in favor of Defendants on these counts.

## I. FACTS

Sallee was hired by the Tennessee Department of Safety on March 16, 1998. She prosecuted forfeiture actions.

In the early afternoon of June 3, 2002, Billy Grooms, Special Agent of the Department of Safety's Criminal Investigation Division, arrived at the Department's Knoxville Legal Office to attend a scheduled seizure hearing. After leaving the office, Grooms notified his supervisor, Don Watson, Special Agent in Charge, regarding his observations of Sallee's condition. (Docket Entry No. 125, Grooms Aff.)

Grooms reported that, while waiting for the seizure hearing, he personally observed Sallee stagger into the office in a disoriented state leading a dog. As Sallee made her way down the hall to a rear office, she had to place her right hand against the wall twice to maintain her balance. Sallee then walked back up the hall crying, and she was very unsteady on her feet. Sallee had to place her right hand on the wall again to maintain her balance. Sallee then returned down the hall, still staggering, and re-entered the rear office. Sallee then staggered out of the office, still crying, and proceeded up the hall into a front office and shut the door. Grooms waited for approximately one and one-half hours and, during his wait he watched various people enter Sallee's office. (Id. ¶¶ 3-11.)

3

At approximately 2:00 p.m., Grooms entered Sallee's office and informed her that he was there for the seizure hearing scheduled for 1:00 p.m. in the Knoxville office. Grooms reported that, in speaking with Sallee, he could tell her speech was very slurred and her eyes were glassy. Grooms reported that Sallee told him he needed to go to Chattanooga. He stated he was instructed to be in Knoxville. Sallee repeated that Grooms needed to go to Chattanooga. Grooms responded that he was not going to Chattanooga, to which Sallee replied that Grooms needed to go to Fall Branch. Grooms told Sallee again that he was scheduled to be in Knoxville, but the people from whom he was to seize a truck were not there. Sallee grabbed a paper out of a pile and stated, "Here it is, you can leave, we will forfeit the vehicle and I will send you a letter in the mail." (Id. ¶¶ 12-19.)

Grooms reported that he did not get close enough to Sallee to smell her breath, but he was certain she was under the influence of something given the way she walked and talked, her demeanor, and her unprofessional conduct. (Id. ¶ 20.) Upon leaving the office Grooms notified Special Agent in Charge Watson, who notified Sam Nelson, Director of Criminal Investigations Division, who in turn notified Gerald Allen, Director of Internal Affairs. (Id. ¶¶ 21-23.) Allen reported the matter to Commissioner King, who ordered Internal Affairs to open an investigation regarding Sallee's conduct. (Docket Entry No. King Aff. ¶¶ 4-5.) The investigation took several weeks to complete and was conducted by the Internal

4

Affairs Division with assistance from the Criminal Investigation Division. (Crownover Aff. ¶¶ 6-7.)

Sallee does not dispute that Grooms made the report about her conduct to his superior, but she disputes the accuracy of his report. Sallee attests that she was very upset over personal matters on June 3, 2002. She had been sobbing and was emotionally distraught, which caused her to appear to be acting strangely. (Docket Entry No. 134-3, Sallee Aff. ¶ 18.) Attorney Scott Jones attests that he was also present in the Knoxville office on June 3, 2002, and he encountered Sallee, who was emotional and crying about her boyfriend. Jones went to the back room to speak with Sallee, and she was not intoxicated or under the influence of any drugs. Her speech was not slurred and she did not stagger around the office. In his opinion, Sallee's faculties were fully intact and her conduct did not warrant suspicion. (Docket Entry No. 134-5, Jones Aff. ¶ 5.)

Citing General Order Number 216-1, Sallee denies that Grooms followed proper procedure in reporting the matter to his supervisor. (Docket Entry No. 135 ¶ 14.) The General Order provides that non-supervisory personnel "shall refer the complaint to a supervisor if one is readily available" and "[i]f, after exploration the supervisor determines that this is a valid complaint the complaint shall be forwarded to the Internal Affairs division to be classified as a valid complaint."[3] Sallee also

_____

[3]Sallee claims she did not receive written notice of the complaint or an opportunity to respond to it. General Order 216-1

5

contends she should have been tested for substance abuse (Sallee Aff. ¶ 20), but Defendants contend General Order Numbers 220 and 220-1, concerning testing of employees suspected of substance abuse, were not applicable to Agent Grooms, who was not a supervisor. (Docket Entry No. 128, Crownover Aff. ¶ 10.)

Special Agent L.D. Moree, Jr., of the Criminal Investigation Division, investigated the complaint. He interviewed several employees of the Department of Safety legal office, including Cheryl Raulston, Joy Madden, Fredia Craig, Lisandra Tucker, Joe Bartlett, and Tom Henley. (Docket Entry No. 120, Ex. B; Docket Entry Nos. 122-124, 130-131.) Moree received a statement from Tennessee Highway Patrol Trooper Gregory Roberts describing behavior of Sallee that he witnessed while appearing for hearings at the legal office. Roberts believed Sallee's conduct was indicative of drug dependency. (Docket Entry No. 129, Roberts Aff.) Moree also interviewed Mary Lynn Mathis, a former Department of Safety lawyer in the Knoxville office who had complaints about Sallee. Finally, Moree learned that Sallee had not reported an

---

at VII. D. provides:

> Employees, against whom complaints are filed, will be notified in writing (unless unusual circumstances dictate otherwise), that a complaint has been received, the nature of the complaint, that an investigation will be conducted, that they will be afforded an opportunity to give a statement unless the situation dictates otherwise, and upon conclusion the employee will receive written notification of the results of the investigation.

Gerry Crownover attests that the investigators' decision not to notify Sallee or to take her statement was made in accordance with this General Order. (Crownover Aff. ¶ 16.)

accident that occurred while she was driving a state vehicle. (Docket Entry No. 120, Ex. B.)

On July 10, 2002, upon completion of the investigation, Commissioner King held a meeting attended by Scott, Allen, Nelson, Watson, Moree, Crownover, Hutto, and Roland Colson. (King Aff. ¶ 6.) Allen presented the results of the investigation:

a. Ms. Sallee had come to work under the influence of drugs and in an intoxicated state. . . .
b. Ms. Sallee had a habitual pattern of not coming to work, coming in late and/or leaving early without reporting the absences on her attendance sheets. . . .
c. It was also revealed that Ms. Sallee had habitually canceled hearing dockets at a moment's notice after the parties had already arrived. . . .
d. Ms. Sallee would habitually sleep on the floor in her office during business hours as well as bring her dog to the office. . . .
e. Ms. Sallee would dress inappropriately and unprofessionally at the office . . .
f. Ms. Sallee would also excessively use the State's long distance line to make personal calls to her boyfriend in New Mexico during business hours and on weekends.[4] . . . Given the fact that the Department of Safety's telephone records indicate that Ms. Sallee's misuse of State telephones constituted fifty hours of long distance call time, [King] considered this to be excessive misuse. However, [King has] never asked or requested Ms. Sallee to reimburse the State for the fifty hours of alleged misuse of the State telephones.
g. The investigation also showed the unauthorized use of a State Federal Express Account to send personal packages. . . .[5]

---

[4]Sallee claims that her immediate supervisor, Joe Bartlett, and Hutto, General Counsel, told her she could use the watts line for personal use. Bartlett testified that he twice allowed Sallee to use the watts line to call New Mexico. (Docket Entry No. 134-11, Bartlett Depo. at 66.)

[5]Sallee attests that she always entered her personal credit card number on the Federal Express labels and she did not intend for the State to pay the shipping on her packages, but due to a Federal Express charging error, the State was billed. (Sallee Aff. ¶ 10.) She produces a copy of one such label. (Docket Entry No.

7

> h. Ms. Sallee had employees do personal work for her on
> State time such as typing, having employees run personal
> errands for her on State time such as taking her dog to
> the veterinarian, having employees run unauthorized
> vehicle tag information on the State's computer. . . .
> i. Ms. Sallee failed to report an accident in a State
> vehicle. Ms. Sallee also portrayed unprofessional
> conduct toward a citizen involved in the accident. . . .[6]
> j. Ms. Sallee was intimidating the employees in the
> office and creating a hostile work environment by
> screaming and yelling on occasions[.][7]

(King Aff. ¶ 6.) It was Hutto's opinion that Sallee could not

function as an attorney in the Legal Office of the Department of

Safety. (Hutto Aff. ¶ 13.)

After hearing the results of the investigation, King, as the

appointing authority, made the decision to terminate Ms. Sallee

based on the combination of all offenses. King relied on the

Department of Safety directors, supervisors, and investigators for

Internal Affairs in making his decision to terminate Sallee. (King

Aff. ¶ 7.) King consulted with Gerry Crownover to make sure he was

following policies and procedures. Crownover or the Personnel

_____

134-14.)

[6]On April 1, 2002, Joe Bartlett issued a written reprimand to
Sallee for failing to report the car accident. (Docket Entry No.
142, Ex. 3.) Sallee attests she had reported the accident to
Bartlett at the time it occurred and he told her not to worry about
it. (Sallee Aff. ¶ 19.)
        Bartlett attests that Hutto asked him to investigate a few
complaints the Department received about Sallee regarding her
conduct, but after investigation he concluded the allegations were
typical for a Department of Safety attorney and no action was taken
against her. (Bartlett Aff. ¶ 7.)

[7]In response to these points, Sallee contends she did not sleep
in her office, she and others in the office used flex time, and she
was lenient with support staff and did not mistreat employees.
(Sallee Aff. ¶¶ 8, 12, 16.)

8

Director confirmed that Sallee was an executive appointee; therefore, she was not given a due process hearing. (Id. ¶ 8; Crownover Aff. ¶ 13.) At the conclusion of the meeting, King instructed Colson and Hutto to travel to Knoxville on July 11, 2002, to inform Sallee of King's decision to terminate her employment. (King Aff. ¶ 10.) Hutto attests that Bartlett was completely unaware of Commissioner King's decision to terminate Sallee.[8] (Hutto Aff. ¶ 15.)

On July 11, 2002, Colson and Hutto traveled to Knoxville to deliver a termination letter to Sallee. Upon arriving at the office, they learned that Sallee was not at work and had called in sick. Hutto called Sallee at home and asked her to come to the office, which she did, accompanied by an attorney. The attorney was not allowed in the room where Sallee, Hutto, Colson, and Moree met. Colson informed Sallee of the decision to terminate her employment and the reasons as stated in the letter. At the

---

[8]Bartlett at one time served as the supervisor in charge of the Knoxville office as an Attorney III, but he transferred to the Memphis office in 1998. In November 1998, effective February 1999, Bartlett's position was reclassified to Attorney IV, and Bartlett assumed coordination of all of the legal offices. (Docket Entry No. 131, Bartlett Aff. ¶ 2.)

Upon Bartlett's departure from Knoxville, Beverly Clemmer assumed the position of supervisor in charge of the Knoxville office, and she recommended Sallee's hiring in 1998, although, as will be explained later in this opinion, Bartlett had wanted to hire Sallee earlier.

The record indicates attorneys were considered equals and ultimately reported to Hutto as General Counsel. The attorney who served as supervisor in charge of the Knoxville office became so by default as the most senior attorney in the office, and not because the attorney possessed particular supervisory skill.

conclusion of the meeting, Sallee left the office. (Hutto Aff. ¶¶ 17-20.)

Jeff Whitt, an attorney, accompanied Sallee to her office on July 11, 2002. Hutto, Colson and approximately four or five other individuals, some possibly in uniform, were awaiting Sallee's arrival. Whitt was not immediately allowed to enter the meeting room where Sallee was informed of her termination, but once she had been terminated, Whitt entered the room. He later discovered the incident had been recorded through a wire worn by one of the individuals. He assisted Sallee in retrieving items from her home and returning the state vehicle. Sallee was professional and maintained her composure. Whitt was present in the Knoxville legal office on several occasions and Sallee was always courteous, acted with professional demeanor, and dressed appropriately. He never witnessed Sallee under the influence of drugs or alcohol. (Docket Entry No. 134-13, Whitt Aff.)

Defendants contend that Sallee, like Ed Harris, another Attorney III who worked for the Department of Safety, was an executive appointee, and not a career civil service employee. (Docket Entry No. 127, Graf Aff. & Exs. A-B.) Thus, Sallee was not entitled to a due process hearing prior to her termination.

Sallee argues that General Order Number 216-1 gave her a property interest in her job and therefore, she was entitled to a due process hearing. The General Order provides:

A. Employees who are not on probation have a "property right" to their job. No demotion, suspension, termination or other action will be taken which would

10

deprive an employee of his property right without minimum "due process." When a decision is being made to institute action against an employee that will probably lead to a recommendation for demotion, suspension, or termination, the employee will be advised of this in writing, stating the cause of the action and:

1. Listing rules, regulations, laws, general orders, etc., violated.

2. Listing names, dates, time, place, etc.

(Docket Entry No. 134-6 at 3-4.) Sallee also points to General Order Number 213, which provides that "[a]ny member being dismissed for cause shall be notified at least ten (10) days prior to the date of dismissal." (Docket Entry No. 134-15.) The General Order requires written notice to inform the employee of the reasons for the dismissal and placement of the employee on paid administrative leave for the interim between the cause for dismissal and the termination date. (Id.)

Sallee asserts that she was a career service employee because she filled out a civil service application to gain employment with the State. (Docket Entry No. 134-18.) Defendants contend the State application for employment is the same whether the candidate applies for an executive service or career service position. (Docket Entry No. 141, Graf Aff. ¶ 4.)

Sallee further asserts that Joe Bartlett told her on multiple occasions that she would serve a probationary period. (Sallee Aff. ¶ 13.) Beverly Clemmer attests that Joe Bartlett told her on several occasions that Sallee was on probation for the first six (6) months of her employment. (Docket Entry No. 134-12, Clemmer Aff. ¶ 6.) Sallee's personnel file does show an entry indicating

11

the "Hire Date" was "03-16-1998" and the "Prob Exp Date" was "9-15-1998." (Docket Entry No. 134-17 at 25.)

Defendants produce evidence that all appointments to positions in the Executive Branch, including the Department of Safety, are entered into the State Employee Information System ("SEIS"). (Docket Entry No. 140, Graf Aff. ¶ 4.) Once a state agency enters an appointment to a particular job position into the computer database, a document known as a Daily Input Roster ("DIR") is generated by the computer. (Id. ¶ 5 & Ex. A.) Because data on the status of the position has been stored in the computer database, the Civil Service Status ("CSS") field on the DIR automatically lists the status of the position--either career or executive service. A "Y" appearing in this field indicates that a career service position and an "N" indicates an executive service position. (Id. ¶ 6.) Sallee's DIR shows an "N" under the "CSS" field, meaning her position was classified in the executive service. (Id., Ex. A.) A message is automatically generated in the lower left hand corner of the DIR titled "Exception Messages," which indicates whether an appointment is for a non-civil service executive branch position. (Id. ¶ 6.) Sallee's DIR includes this exception, again indicating her position was classified in the executive service. (Id., Ex. A.)

Gerry Crownover attests that Sallee was not a career service employee; she was an executive service employee. (Crownover Aff. ¶ 13.) As an executive service employee, she served at the pleasure of Commissioner King. (Id.) Tennessee civil service

12

rules that provide for due process do not apply to executive service employees. (<u>Id.</u>)

According to Sandy Graf, Assistant Commissioner for Technical Services, for certain appointments to executive service positions, there is a known error in the computer system which results in the system automatically assigning a probationary date to the person appointed to the executive service position. (<u>Id.</u> ¶ 7.) Although Department of Personnel staff are supposed to check for this computer error and inform the agency of the need to remove the probation date for an executive service appointee, the task does not always get done due to a high volume of work. (<u>Id.</u> ¶ 7.)

Furthermore, all career appointments must have a certification number. The certification number is linked to a record of the specific certificate (certified register) that was used to make the career service appointment. Executive service positions never have a certification number. The employment histories for Sallee and Harris indicate there were no certification numbers assigned for the periods during which they were employed in the position of Attorney III. Therefore, they were executive service employees while employed at the Department of Safety. (Docket Entry No. 127, Graf Aff. ¶¶ 7-8 & Ex. A.) Graf attests that the status of the position as career service or executive service is controlling, not the automatic assignment of a probation date due to a computer error. (<u>Id.</u> ¶ 9.)

Sallee asserts that the Defendants' action in terminating her employment was in retaliation for her prior involvement in protected Title VII activity. In 1996 or 1997, Sallee, a former

Knox County Assistant District Attorney, filed charges with the Equal Employment Opportunity Commission ("EEOC") followed by a sexual harassment lawsuit against Knox County District Attorney Randy Nichols. As a result, the Department of Safety and other agencies refused to employ Sallee for approximately two (2) years. (Sallee Aff. ¶ 4.) Because the Department of Safety continually refused employment, even though Sallee was the most qualified candidate, in 1997 Sallee filed an EEOC complaint against the Department of Safety. (Id. ¶¶ 3, 5.) After the latter suit was filed, the Department of Safety hired Sallee into the position of Attorney III in the Knoxville Office effective March 16, 1998. (Id. ¶ 6; Docket Entry No. 142, Ex. 4.)

Clemmer attests that she first became aware of Sallee when she interviewed with Bartlett for employment in the Knoxville office in 1997. Bartlett told her Sallee was his first choice for the position, but she was not being hired due to her then-pending sexual harassment lawsuit against Nichols. (Clemmer Aff. ¶ 3.) Clemmer further attests that Bartlett told her he believed Sallee would drop her EEOC charge against the Department of Safety after her probationary hiring period ended. (Id. ¶ 8.) Sallee told Bartlett, in Clemmer's presence, that all she wanted was a secure position prosecuting for the state and would drop the charge if she had any job security. (Id. ¶ 9.) Bartlett stated numerous times to Sallee in Clemmer's presence and to Clemmer that Sallee should not drop her charge until her probationary period was over or the Department of Safety would simply fire her for no reason. He

14

advised Sallee several times to wait until her six-month probationary period had ended before she dropped the charge, indicating that, after the probationary period, she would have greater job security. (Id. ¶ 10.) According to Clemmer, Bartlett stated that the State would be "out to get [Sallee]" for complaining to the EEOC. (Id. at ¶ 11.)

Bartlett recalls this differently. Sallee expressed to him that she was concerned she would be fired if she dropped her charge because she was a probationary employee. As a friend, Bartlett told her to wait to drop her charge.[9] (Docket Entry No. 134-2, Bartlett Dep. at 73.)

Sallee did not drop the charge during the first six months of her employment with the Department of Safety. During that six months, the EEOC found that the Department had acted to keep Sallee from being employed in retaliation for her prior sexual harassment lawsuit against Nichols. (Id. ¶ 12.) According to Clemmer, Sallee asked Hutto or Avon Williams, former Department of Safety General Counsel, for some guarantee of employment for at least ten years as consideration for dropping her charge, but the offer was refused. (Id. ¶ 13.) In 1999 Sallee filed suit against the Department of Safety in federal court. (Id. ¶ 14.)

According to Clemmer, after Sallee's probationary period ended, Bartlett repeatedly stated that the State would "look under every rock" to try to get rid of Sallee due to her lawsuit and as

---

[9]The record indicates Bartlett gave favorable testimony for Sallee in her prior action against the Department of Safety.

soon as the lawsuit was over, Sallee would have no employment protection. Bartlett emphasized that Sallee was creating problems with her lawsuit, she would be scrutinized due to the hostility created by the lawsuit, and she should drop the lawsuit because it antagonized "Nashville." (Id. ¶ 15.) Clemmer feared retaliation if she supported Sallee. (Id. ¶¶ 46-54.) Clemmer voluntarily left her employment on May 8, 2000, shortly after she signed an affidavit in favor of Sallee. (Id. ¶ 49.)

Sallee settled her lawsuit with the Department of Safety in September 2000. (Docket Entry No. 26, Amended Complaint ¶ 29.) At some point, Sallee filed another EEOC charge against Bartlett concerning his comment that the Department would "look under every rock" (Sallee Depo. at 74), but the record does not disclose the disposition of this charge.

Sallee asserts that Roger Hutto made unwanted sexual advances to her. Five or six times during the first three to six months of her employment in 1998 he called her at home around 10:30 at night, and during one of the phone calls he repeatedly asked her to "model a red thong" for him. (Sallee Aff. ¶ 14; Docket Entry No. 134-1, Sallee Depo. at 53-55.) Sallee claims Hutto knew about her previous sexual harassment suit against Nichols and Hutto made these advances toward her in spite of her post-traumatic stress disorder. (Id.) At one of the first attorney meetings she attended at the Department of Safety in 1998, Sallee was wearing a baggy sweater and Hutto said that "he wished [she would] wear a tighter shirt because [she] had a nice body and he couldn't see

16

[her] body because the shirt was too baggy or something." (Sallee Depo. at 57, 65.) Hutto also called her on three or four occasions to meet him for lunch at the Cracker Barrel in Crossville on work-related matters that were "pointless," and he always insisted on paying for the meal. (<u>Id.</u> at 57-58.) Nothing overtly sexual occurred during these lunch meetings. (<u>Id.</u> at 62-63, 81.) Sallee testified "there was no constant pressure about it. There were just uncomfortable . . . situations here and there." (<u>Id.</u> at 58.) Sallee did not see Hutto "all the time"; it was unusual for him to travel to Knoxville. (<u>Id.</u>) The last lunch meeting occurred in January or February 2002. (<u>Id.</u> at 65.) On one occasion, while Sallee was in Nashville working on a case, Hutto called Sallee three or four times and asked to visit Sallee's hotel room, ostensibly to help her with a brief. (<u>Id.</u> at 62.) Sallee knew Hutto was a womanizer and had committed sexual acts while at the office. (<u>Id.</u> at 70-71.) Sallee "was pretty well insulated from Mr. Hutto" and usually dealt with him only by telephone. (<u>Id.</u> at 70, 73-74.)

Sallee claims she reported these incidents of sexual harassment to Beverly Clemmer and Joe Bartlett, and that Clemmer reported the incidents up the chain of command as required by the General Order regarding sexual harassment. (Sallee Aff. ¶ 15.) Sallee testified at her deposition, however, that she went to Clemmer crying about Hutto's conduct and she did not intend for Clemmer to report to Hutto the information she disclosed to Clemmer in confidence as a sympathetic female. (Sallee Depo. at 58, 60-

17

61.) If Clemmer had told Sallee what she intended to do, Sallee would have made a formal written complaint, but she did not understand what Clemmer was going to do and Sallee was "somewhat surprised." (Id. at 58-59.) Sallee just wanted the conduct to stop because she was "battle weary," and it did not occur to her to report Hutto's conduct in writing. (Id. at 59.)

Bartlett attests that, while he was having lunch one day with Clemmer and Sallee in Knoxville, Sallee stated that Hutto called and asked her to wear a red thong for him. This conversation took place prior to February 1999, when Bartlett was elevated to Attorney IV and supervisor over all of the attorneys, and this was the only time Sallee ever mentioned this incident to Bartlett or made any other complaint about improper conduct. He claims that neither he nor Clemmer was Sallee's supervisor at the time of Hutto's phone call to Sallee. (Docket Entry No. 131, Bartlett Aff. ¶ 3-4.)

Clemmer attests that Sallee came to her complaining that Hutto had sexually harassed her by calling her late at night at home and asking her to wear a red thong. (Clemmer Aff. ¶ 20.) Clemmer reported this to Bartlett, who contacted Hutto and advised him of the allegations against him. Hutto then called Clemmer, asked what Sallee had said, and denied the allegations. Clemmer attests that she later learned from Sallee that Hutto's inappropriate behavior did not stop. (Id.) This contrasts, however, with Sallee's deposition testimony that Hutto's behavior stopped after Sallee told Clemmer about it. (Sallee Depo. at 59.) Sallee did not file

18

an EEOC charge concerning Hutto's sexual harassment, and raised it only after the termination of her employment. (Id. at 75-76.)

According to Crownover, the Department of Safety has no record or knowledge that Sallee reported any incident of sexual harassment in accordance with written policy, General Order Number 217. (Crownover Aff. ¶¶ 11-12.) This policy provides that an employee who experiences sexual harassment has "the primary obligation to bring the problem to the attention of the appropriate supervisor or manager." (Docket Entry No. 119, Ex. 1 at 3.) Additionally, the policy provides:

> Any employee who is uncomfortable for any reason in bringing such a matter to the attention of their supervisor should report the incident to the Department of Safety's Human Resource Division. If a complaint involves a director or other top management official, the complaint shall be filed directly with the Department of Personnel, Employee Development and EEO Division or with the Employee Relations Division of that department. This department will promptly investigate all allegations of sexual harassment confidentially, and take appropriate corrective action if warranted.

(Id.)

Denny King attests that he did not discuss Sallee's termination with Randy Nichols, state legislators, or the Governor's Office. (King Aff. ¶ 9.) Neither King nor Deputy Commissioner Scott were involved in Sallee's 1999 lawsuit against the Department. (Id. ¶ 2.)

## II. STANDARD OF REVIEW

In ruling on a motion for summary judgment, this Court must construe the evidence produced in the light most favorable to the non-moving party, drawing all justifiable inferences in his or her

19

favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A party may obtain summary judgment if the evidentiary material on file shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of satisfying the court that the standards of Rule 56 have been met.  See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986).  The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson, 477 U.S. at 248.  If so, summary judgment dismissal is inappropriate.

To defeat a properly supported motion for summary judgment, an adverse party "must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."  Fed. R. Civ. P. 56(e).  The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue for trial is triggered once the moving party "show[s] – that is, point[s] out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

### III.  ANALYSIS

**A.  Retaliation claims**

Sallee concedes that she does not have direct evidence of retaliation and therefore, she must proceed under the McDonnell Douglas burden-shifting formula.  (Docket Entry No. 134, Memorandum

20

at 2.)  To establish a prima facie case of retaliatory discharge,[10] a plaintiff must show that: (1) she engaged in protected Title VII activity; (2) the employer knew about her exercise of civil rights; (3) thereafter, the employer took action against her that would have been materially adverse to a reasonable employee; and (4) there was a causal connection between the protected activity and the employer's action.  <u>Burlington Northern & Sante Fe Railway Co. v. White</u>, — U.S. —, 126 S.Ct. 2405, 2409 (2006); <u>Allen v. Michigan Dept. of Corrections</u>, 165 F.3d 405, 412 (6th Cir. 1999).  Defendants contend that Sallee cannot prove her prima facie case because she cannot establish a causal link between her termination in July 2002 and her 1999 lawsuit against the Department of Safety which was settled in September 2000.  <u>See</u> <u>Zanders v. National R.R. Passenger Corp.</u>, 898 F.2d 1127, 1135 (6th Cir. 1990) (observing causal link requires plaintiff to proffer evidence sufficient to raise inference that her protected activity was likely reason for adverse action).

To establish the causal connection required by the fourth element of the prima facie case, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not engaged in protected activity.  <u>See</u> <u>EEOC v. Avery Dennison Corp.</u>, 104 F.3d 858, 861 (6th Cir. 1997); <u>Jackson v. RKO Bottlers</u>, 743 F.2d

---

[10]The Court may consider together the theories brought under Title VII and the THRA.  <u>See</u> <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 582 (6th Cir. 1992).

370, 377 (6th Cir. 1984). "Although no one factor is dispositive in establishing a causal connection, evidence that the defendant treated the plaintiff differently from identically situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." Allen, 165 F.3d at 413. While "temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection." Randolph v. Ohio Dept. of Youth Servs., 453 F.3d 724, 737 (6th Cir. 2006); Little v. BP Exploration & Oil Co., 265 F.3d 357, 363-364 (6th Cir. 2001).

Sallee has not produced evidence sufficient to generate a genuine issue of material fact for trial on the element of causal connection.[11] Sallee has not shown even a temporal proximity between her protected Title VII activity, which ended with settlement of her lawsuit against the Department in September 2000 and her discharge nearly two years later in July 2002. Even shorter periods between protected activity and discharge fail to provide the inference of causal link necessary to establish a prima facie case. See e.g. Clark County Sch. Dist. v. Breeder, 532 U.S. 268, 273 (2001) (finding twenty months too long a period of time to

_____

[11]Sallee cites page 112 of her own deposition and page 58 of Bartlett's 2000 deposition, but those pages are not provided in support of her summary judgment response. (See Docket Entry Nos. 134-1 & 134-2.) Sallee also mentions that she filed an affidavit in support of a sexual harassment claim by Judge Morgan, (Docket Entry No. 134, Memorandum at 5), but she does not provide any evidence to support her statement or explain how her conduct resulted in retaliation by Defendants.

22

raise inference of causation); <u>Haywood v. Lucent Technologies, Inc.</u>, 323 F.3d 524 (7th Cir. 2003) (one year deemed too long to establish causal connection); <u>Cooper v. City of North Olmsted</u>, 795 F.2d 1265, 1272 (6th Cir. 1986) (holding discharge four months after filing discrimination claim is insufficient to support inference of retaliation); <u>Brown v. ASD Computing Ctr.</u>, 519 F.Supp. 1096, 1116 (S.D. Ohio 1981) (holding discharge three months after announcement of intention to consult EEOC did not provide necessary causal inference).

Taking as true Bartlett's comments to Sallee shortly after her hiring in March 1998, more than four years before her discharge, and viewing those comments as some direct evidence of the Department's retaliatory motive, the comments are nonetheless too remote in time to establish the necessary causal nexus. <u>See</u> <u>Oest v. Illinois Dept. of Corrections</u>, 240 F.3d 605, 611 (7th Cir. 2001) ("When employing the direct proof method, a Title VII plaintiff also must demonstrate that the discriminatory remark was causally related to the adverse employment action at issue.")

Moreover, the record shows that King, who made the final decision to terminate Sallee's employment, was not a decision-maker involved in Sallee's previous lawsuit against the Department. He was not appointed Commissioner until January 2002. (King Aff. ¶ 3.) Sallee fails to produce any evidence to link King to any retaliatory motive that may have existed against her in 1998. Sallee's subjective belief that King intended to retaliate against her, without affirmative evidence of such, is insufficient to

23

establish a claim of retaliation. See Adair v. Charter County of Wayne, 452 F.3d 482, 491 (6th Cir. 2006) (citing Mitchell v. Toledo Hosp., 964 F.2d 577, 584-585 (6th Cir. 1992)).

In addition to the lack of a causal connection, Sallee has not produced any other indicia of retaliatory conduct. See Randolph, 453 F.3d at 737. During Sallee's tenure, the Department received some complaints about her conduct, but Bartlett investigated the reports and did not find any cause to discipline Sallee because the complaints were similar to ones brought against other Department attorneys. In April 2002, Bartlett gave Sallee a written reprimand concerning her failure to report an accident which occurred while she was driving a State vehicle, but Sallee does not deny that the accident occurred or that she failed to report it. She does not even contend, let alone provide proof, that the written reprimand was retaliatory at the time Bartlett imposed it. Sallee's failure to report the accident became relevant to the issue of retaliation only because the event surfaced during the internal affairs investigation, and Sallee's failure to report the accident was one of several reasons why King decided to terminate her employment. Sallee has not produced any evidence that a similarly-situated employee was not retaliated against. See Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000).

Even if the Court assumes that Sallee can prove a prima facie case of retaliation, summary judgment is still warranted. Defendants produced legitimate, non-retaliatory reasons why King terminated Sallee's employment. See Brown v. Crowley, 312 F.3d 782, 805 (6th Cir. 2002) (noting prima facie case creates rebuttable

24

presumption of retaliation and burden of proof shifts to defendants to articulate legitimate, non-retaliatory reason for the adverse action; burden then shifts back to plaintiff to prove pretext). Sallee claims through her own testimony that Defendants' stated reasons were false, but she has not produced any evidence to create a jury question on whether retaliation was the real reason for her dismissal. See <u>Virts v. Consolidated Freightways Corp.</u>, 285 F.3d 508, 521 (6th Cir. 2002) (observing reason cannot be proved pretext for retaliation unless it is shown both that reason was false *and* that retaliation was the real reason). For these reasons, the Court concludes that Defendants are entitled to summary judgment on the Title VII retaliation claim.

The parties have not addressed Sallee's claim for common law retaliatory discharge under Tennessee law (Count Six). The elements of the common-law claim are: (1) an employment-at-will relationship existed; (2) the employee was discharged; (3) the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy. <u>Crews v. Buckman Lab. Int'l, Inc.</u> 78 S.W.3d 852, 862 (Tenn. 2002).

For all of the reasons stated with regard to the Title VII/THRA retaliation claims, the Court concludes that Sallee failed

25

to generate a genuine issue of material fact for trial as to whether a substantial factor in King's decision to discharge Sallee was Sallee' exercise of protected rights. Defendants are entitled to summary judgment on this claim as well.

**B. Due process claim**

"The question whether a particular job action against a public employee implicates a constitutionally protected property interest is a question of law[.]" Deen v. Darosa, 414 F.3d 731, 734 (7th Cir. 2005); TriHealth, Inc. v. Board of Comm'rs, 347 F.Supp.2d 548, 559 (S.D. Ohio 2004). Property interests are created and defined by independent sources such as state law. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985); Hamilton v. Myers, 281 F.3d 520, 529 (6th Cir. 2002). To prevail on a procedural due process claim under 42 U.S.C. § 1983, Sallee must show that she had a protected property interest in continued employment and that her property interest was abridged without appropriate process. See Hamilton, 281 F.3d at 529. The Court concludes as a matter of law that Sallee cannot establish she possessed a property interest in continued employment as an Attorney III.

The Tennessee Civil Service Code "divides all positions in the state service between career service and executive service." Armstrong v. Department of Veterans Affairs, 959 S.W.2d 595, 597 (Tenn. Ct. App. 1997). Among the positions designated for the executive service are specific positions defined by the titles of the positions, such as members of boards, commissions, agencies and authorities and the chief executive officer of such entities.

Tenn. Code Ann. § 8-30-208(b)(1); Armstrong, 959 S.W.2d at 597.
The executive service also includes positions which are not defined
by job title, but by job description: "[a]ny position serving in a
confidential administrative or program management capacity to a
commissioner, deputy commissioner, assistant commissioner or
equivalent authority." Id. § 8-30-208(b)(5); Armstrong, 959 S.W.2d
at 597.

Only career service employees who have successfully completed
their probationary periods of six (6) months are called "regular
employees" and are given certain protections under the Civil
Service Code. Armstrong, 959 S.W.2d at 597. While executive
service employees serve at the pleasure of their employer, Tenn.
Dept. of Personnel R. § 1120-10-.02, regular employees in career
service acquire property rights in their positions. Tenn. Dept. of
Personnel R. § 1120-10-.03(1); Armstrong, 959 S.W.2d at 597. A
career service employee may not be deprived of continued employment
without minimum due process protections. Id. Department of Safety
General Orders 213 and 216-1 appear to follow these and other state
statutes and rules governing protections afforded to career service
employees. See Tenn. Code Ann. § 8-30-326 (providing that regular
employees in career service may not be dismissed without ten days
notice and opportunity to respond, which is also subject of General
Order 213).

Defendants' uncontroverted evidence leads the Court to
conclude as a matter of law that Sallee was an executive service
employee who served at the pleasure of her employer, Commissioner

27

King, and consequently, she did not have a property interest in her employment which entitled her to pre-termination due process protection. Sallee attempts to lay claim to the protection of the career service by suggesting that Joe Bartlett told her she would serve a probationary period and, upon successful completion of that period, she would become a regular employee in career service. Even taking as true that Bartlett made such statements, the record confirms that Bartlett was also an Attorney III who was not Sallee's supervisor at the time he made the remarks in 1998, and Bartlett did not have authority to bind the Department before he assumed a supervisory role in 1999.[12] (Bartlett Aff. ¶ 8, Ex. C at 000031.) Because Sallee could be dismissed for cause at the pleasure of the Commissioner, she cannot invoke at a hearing her unilateral understanding, based on the oral statements of Bartlett or a computer error in a DIR form, that she was entitled to retain her employment once she successfully completed probation. <u>See McClain v. Northwest Comm. Corrections Ctr. Judicial Corrections Bd.</u>, 440 F.3d 320, 330 & n.2 (6th Cir. 2006) (observing that where public employee could be dismissed for cause, she could not invoke at a hearing a mutually explicit understanding that she was entitled to retain her employment); <u>cf.</u> <u>Perry v. Sinderman</u>, 408 U.S. 593, 601 (1972) (property interest may arise from "mutually explicit understanding").

---

[12]The Court declines Sallee's invitation to apply equitable estoppel so that Defendants are precluded from denying that Sallee had a property interest in her employment.

Case 3:03-cv-00723   Document 143   Filed 11/29/06   Page 28 of 33 PageID #: 946

Sallee could be discharged without a hearing or notice. <u>Curby v. Archon</u>, 216 F.3d 549, 555 (6th Cir. 2000). Thus, Defendants are entitled to summary judgment on this claim.

**C. Sexual harassment claim**

A hostile work environment claim actionable under Title VII and the THRA exists if the workplace is permeated with sexually discriminatory intimidation, ridicule and insult that is sufficiently severe and pervasive to alter the conditions of the plaintiff's employment, and if an objectively reasonable person would view, and the plaintiff herself did view, the environment as abusive. <u>See</u> <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 78, 81 (1998); <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21-22 (1993); <u>Campbell v. Florida Steel Corp.</u>, 919 S.W.2d 26, 31-32 (Tenn. 1996). To prevail on a claim of sexual harassment, Sallee must prove: (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the sexual harassment had the effect of unreasonably interfering with her work performance and creating an intimidating, hostile, or offensive working environment; and (5) the existence of employer liability. <u>See</u> <u>Williams v. General Motors Corp</u>, 187 F.3d 553, 560-561 (6th Cir. 1999); <u>Campbell</u>, 919 S.W.2d at 31.

"Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] . . . because of . . . sex.'" <u>Oncale</u>, 523 U.S. at 80 (emphasis in original); <u>Morris v. Oldham County Fiscal Court</u>, 201 F.3d 784, 790

(6th Cir. 2000). The Supreme Court has "never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations." Oncale, 523 U.S. at 80. Thus, a plaintiff cannot prevail by showing the conduct at issue was "tinged with offensive sexual connotations." Id. Rather, the critical issue is "'whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" Id. (quoting Harris, 510 U.S. at 25)).

The inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by the individual. Oncale, 523 U.S. at 81. In determining whether the alleged harassment was sufficiently severe and pervasive, the Court must consider the totality of the circumstances. Williams, 187 F.3d at 562. The Court must take into account the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. Moreover, personal conflict "does not equate with discriminatory animus." Morris, 201 F.3d at 791; Barnett v. Department of Veterans Affairs, 153 F.3d 338-342-343 (6th Cir. 1998).

The Court concludes that Sallee has not produced sufficient evidence to show that Hutto's behavior created a sexually hostile work environment. See Clark v. UPS, Inc., 400 F.3d 341, 351-352

30

(6th Cir. 2005). Sallee complains of Hutto's five or six night-time phone calls to her home shortly after she began work in 1998, during one of which he asked her to model a red thong for him; his comment within a few months after she began work in 1998 that he wanted her to wear a tighter shirt so that he could see her body; his requests on one occasion to join her in a hotel room; and his practice of inviting her to lunch at Cracker Barrel during which nothing overtly sexual occurred. The last incident occurred in early 2002. These incidents were spread over the course of nearly four years and, viewed objectively, they were not particularly severe or pervasive. Sallee admits that she was insulated from Hutto, he did not ordinarily travel to Knoxville, and she generally dealt with him by telephone. She does not claim that any incident involving him was physically threatening or humiliating. When she complained to Clemmer about Hutto's late-night phone calls, the calls stopped. Defendants' brief cites numerous cases in which courts have rejected sexual harassment claims based on conduct far more egregious than that asserted here. (Docket Entry No. 119, Memorandum at 13-15.) The Court relies on such cases, even though they are not cited here in this already lengthy opinion.

Sallee does not identify any adverse employment action she suffered because of Hutto's alleged conduct prior to her termination, and she concedes she did not pursue a legal claim of sexual harassment until after she was terminated. Because Sallee has not carried her burden on the elements of her claim, the Court does not reach the issue of whether Sallee reported Hutto's conduct

31

to the proper management official and whether the Department of Safety is entitled to the affirmative defense under <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998). Sallee has failed to produce sufficient evidence of a hostile work environment to proceed to a jury, and summary judgment is appropriate.

Sallee does not respond to Defendants' contention that Hutto cannot be held individually liable under the cause of action for aiding and abetting discriminatory conduct under the Tennessee Human Rights Act. Thus, the Court concludes that Sallee does not resist summary judgment on this ground. <u>See</u> Local Rule 7.01(b). Because Defendant Hutto has shown his entitlement to summary judgment as a matter of law on this issue, (Docket Entry No. 119 at 15-17), summary judgment will be entered in favor of Defendant Hutto.

**D. Claims against Commissioner King are time-barred**

Sallee complained of her July 11, 2002 termination in her initial complaint filed on July 11, 2003, but she did not name Commissioner King as a defendant. Sallee added King as a defendant in her Amended and Restated Complaint filed December 1, 2003. Because Sallee's causes of action relating to her termination accrued on July 11, 2002, King contends that the § 1983 and state tort claims now asserted against him are barred by the applicable one-year state statute of limitations. <u>See</u> Tenn. Code Ann. § 28-3-104(a)(3); <u>Wilson v. Garcia</u>, 471 U.S. 261 (1985). Sallee does not respond to this argument, which indicates no opposition to it. L.R. 7.01(b).

32

The Court agrees that Sallee's claims brought against Commissioner King in his individual capacity are time-barred. Thus, he is entitled to summary judgment on this ground as well.

## IV. CONCLUSION

For all of the reasons stated, Defendant's Motion for Summary Judgment (Docket Entry No. 118) will be granted in its entirety. This case will be dismissed with prejudice.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE